MR. JUSTICE SHEA
dissents:
I dissent because this natural gas pipeline plainly and properly comes within the definition of a “facility” under the Montana Major Facility Siting Act.
Section 70-803(3)(c), R.C.M.1947, now section 75-20-104(7)(c) MCA provides:
“ ‘Facility’ means:
“(c) each pipeline and associated facilities designed for, or capable of, transporting gas, water, or liquid hydrocarbon products *284 from or to a facility located within or without this state of the size indicated in subsection (3)(a) of this section; . . .”
Section 70-803(3)(a)(ii), R.C.M.1947, now section 75-20-104(7) (a)ii) MCA provides:
“ ‘Facility’ means:
“(a) each plant, unit, or other facility and associated facilities, except for oil and gas refineries,
“(ii) designed for, or capable of, producing twenty-five million (25,000,000) cubic feet of gas per day or more, or any addition thereto having an estimated cost in excess of two hundred fifty thousand dollars ($250,000), or . . .”
The question, then, is whether the pipeline to or from which the pipeline would lead is designed for or capable of “producing” 25 million cubic feet of gas per day or more. The Greycliff connection is tied in with MPC’s total gas production system which is capable of producing approximately 290,000 million cubic feet of gas per day. Therefore, the proposed pipeline leads from or to a facility capable of producing in excess of 25 million cubic feet of gas per day.
Preliminarily, the majority opinion noted that section 70-20-104 MCA was recently amended so as to exclude natural gas pipelines from the Siting Act. This fact, according to the opinion, “would seem to limit considerably the necessity for . . . statutory construction.” In this case, we are concerned with the Act as it existed before the 1979 amendment. If anything, the amendment indicates that the legislature sought to change existing law (Tuttle v. Morrison-Knudson Co. (1978), 177 Mont. 166, 580 P.2d 1379, 1382; Montana Milk Control Bd. v. Community Creamery Co. (1961), 139 Mont. 523, 526, 366 P.2d 151, 152), and the change is effective only after the date of the amendment. Section 43-510, R.C.M.1947, now section 1-2-203 MCA.
The opinion regards the fact that the Department has not considered gas lines connecting other gas lines to be “facilities” as deserving of “great deference”. Dept. of Rev. v. Puget Sound Power *285 and Light Co., supra. The cited case stated, but did not apply, this notion of statutory construction. However, Doe v. Colburg (1976), 171 Mont. 97, 100, 555 P.2d 753, 754 did, stating:
“This Court has on several occasions considered the interpretative regulations by administrative agencies charged with the duty of administering and enforcing a legislative act, for an understanding of the provisions that must be carried out. (Cites omitted).
“While such administrative interpretations are not binding on the courts, they are entitled to respectful consideration.” (Emphasis added.)
Here, no interpretive rulings on the Department’s treatment of pipeline-to-pipeline facilities exist. Surely, the Department’s inaction cannot be viewed as the legal equivalent to the promulgation of an interpretive ruling.
The opinion then declares that Montana’s rules of statutory construction may be summarized in a four-part analysis. This analysis neglects to mention the fundamental rule that legislative intent must first be determined from the plain meaning of the words used. Section 93-401-15, R.C.M.1947, now section 1-2-101 MCA; Dunphy, supra; Teamsters Local # 45, supra; Cashmore, supra. Instead, the opinion reserves the inquiry and asks, “[d]oes the interpretation reflect the intent of the legislature considering the plain language of the statute?” In short, does our opinion find support in the statute?
Turning to the legislative policy statement in section 70-802, R.C.M.1947, now section 75-20-102 MCA, the opinion seizes upon the “key phrase” — “conversion facilities” — as a statement of the Act’s limited coverage. Even a cursory reading of the provision demonstrates that the legislative concern was not restricted to energy conversion facilities, but was generally aimed at furthering this State’s policy of maintaining and improving “a clean and healthful environment... to protect the environmental life support system from degradation and prevent unreasonable depletion and degradation of natural resources.” Section 70-802, supra. It is not inconsistent with this policy to impose siting requirements *286 regulating the location, safety, construction and maintenance of gas pipelines. Indeed, the need for such legislation has prompted enactment of similar laws both by the United States Congress (49 U.S.C. § 1671, et seq.) and by our sister states (see e. g., Wash.Rev. Code § 80.50.010, et seq., and Or.Rev.Stat. § 757.039.)
To bolster its decision the Court attempts to trace a “common thread linking the defined facilities together” and determines that the common denominator is the conversion process necessary to produce the other enumerated energy forms. It appears the Court went too far in its search for commonality. For example, in discussing the definition of liquid hydrocarbon producing facilities, section 75-20-104(7)(a)(iii), it is stated that only such facilities that convert a raw material, such as coal, to a liquid hydrocarbon product are included. This totally unsolicited statement is not supported by the legislative history of section 75-20-104(7)(a)(iii). The 1975 Legislature specifically deleted any reference to gasification or liquefaction facilities for the obvious purpose of broadening the scope of the definition.
If there is a “common thread” linking the facilities subject to the siting requirements of the Act, it is simply the potential environmental impact posed by each of the enumerated facilities.
The District Court ruled correctly that the proposed gas pipeline is a “facility” and therefore subject to the requirements of the Major Facility Siting Act. Under the Act, the utility cannot conduct eminent domain proceedings until it has obtained a certificate of environmental compatibility and public need from the Department of Natural Resources and Conservation. Therefore, I would affirm the District Court order dismissing eminent domain proceedings.